ZACHARIAH et al., Appellants,

v.

ROBY et al., Appellees.

[Cite as *Zachariah v. Roby,* 178 Ohio App.3d 471, 2008-Ohio-4832.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 08AP–99.

Decided Sept. 23, 2008.

472

473

Paul O. Scott Co., L.P.A., and Paul O. Scott, for appellants.

Utrecht & Young, L.L.C., and James D. Utrecht, for appellee Joseph Ramge.

Reminger Co., L.P.A., Michael J. Valentine, and Melvin J. Davis; and Baran, Piper, Tarkowsky, Fitzgerald & Theis Co., L.P.A., and Robert B. Fitzgerald, for appellee Carson Barnes.

Karr & Sherman Co., L.P.A., Keith M. Karr, and David W. Culley, for amicus curiae Robert J. Roby.

T. Bryant, Judge.

{¶ 1} Plaintiffs-appellants, Dustin S. Zachariah and his mother, Katherine E. Piper, appeal from a judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendants-appellees, Joseph Ramge and Carson Barnes. For the following reasons, we reverse the trial court's judgment and remand the matter for further proceedings.

{¶ 2} Ramge, Barnes, Jesse Howard, Corey Manns, Dailyn Campbell, Taylor Rogers, and Joshua Lowe were friends as well as teammates on the Kenton High School football team. On the evening of November 18, 2005, Lowe drove his parents' sport utility vehicle ("SUV"), accompanied by Manns, Rogers, Howard, and Campbell, to a residence located in a nearby town and stole a target deer with the intention of later placing it in the travel lane of a rural highway. The group transported the stolen target deer to Lowe's garage; Campbell spray-painted it while others removed the metal pegs from its legs and replaced them with wooden blocks so it could stand upright on pavement.

{¶ 3} At some point during this process, Rogers became ill and left. Manns telephoned Barnes and told him about the plan to place the target deer in the roadway. Manns asked Barnes if he and Ramge, who was with Barnes, wanted to come along. Barnes and Ramge, although initially hesitant, agreed to join the group, and the two drove to Lowe's house.

{¶ 4} When Ramge and Barnes arrived, the others were loading the target deer into the back of Lowe's SUV. All six teens then entered the SUV. Campbell suggested they set up the target deer on County Road 144 ("CR 144"), a two-lane rural highway. Following some discussion about alternative placement, the group eventually settled on a spot on the other side of a rise in the eastbound lane of CR 144. Campbell and Manns retrieved the target deer from the back of the SUV and placed it in the center of the travel lane; Howard, Lowe, Ramge, and Barnes remained inside the SUV.

{¶ 5} Manns and Campbell returned to the SUV, and Lowe began driving up and down CR 144 in order to observe the reactions of motorists suddenly confronted by the target deer positioned directly in their line of travel. The group eventually followed two motorists who approached the target deer, navigated around it, and continued on their way. Lowe then turned around and headed west on CR 144. A few minutes later, the group passed three motorists traveling east toward the target deer; the last of the three was traveling at a high rate of speed. Lowe turned around and followed the vehicles. The driver of the third vehicle, Robert J. Roby, apparently crested the hill, swerved to avoid the target deer, and lost control of his vehicle. The vehicle flipped several times and came

to rest in a field. Roby and his passenger, Zachariah, sustained serious physical injuries as a result of the accident.

{¶ 6} When the group traveling in the SUV approached the area where they had placed the target deer, they observed Roby's vehicle in the field. According to Campbell, the six teens were "scared and panicking" and did not know what to do. They left the scene and agreed not to discuss their involvement with the target deer or the accident with anyone. All six teens were eventually arrested and charged with various crimes.

{¶ 7} On December 5, 2006, plaintiffs filed a complaint against, as pertinent here, Ramge, Barnes, Howard, Manns, Campbell, Rogers, and Lowe.[1] Plaintiffs alleged that Ramge, Barnes, and the other codefendants individually and/or jointly negligently placed, or caused to be placed, the target deer in the roadway. Plaintiffs further claimed that Ramge and Barnes were engaged in a joint enterprise with the other codefendants to place the target deer in the roadway. Plaintiffs also alleged that the negligence of Ramge, Barnes, and the other codefendants proximately caused the accident that resulted in Zachariah's injuries. In addition, Piper asserted a claim for loss of her son's consortium.

{¶ 8} Ramge and Barnes filed separate motions for summary judgment. Both denied liability on grounds that plaintiffs failed to establish the duty element of their negligence claim. More specifically, both maintained that they owed no legal duty to Zachariah because they did not actively participate in any misconduct that caused his injuries, i.e., they did not participate in procuring the target deer, painting it, assembling it, loading it into the car, or placing it in the roadway. Both further claimed that they had no legal duty to protect Zachariah from harm imposed by the other codefendants because they did not have a special relationship with the other codefendants that would have enabled them to control their actions. Both also asserted that plaintiffs' joint-enterprise-imputed-negligence claim failed because even if they had objected to the plan to place the target deer in the roadway, they did not have the right to control the other codefendants' actions, nor were the other codefendants obligated to obey any objections they may have raised. In addition, they argued that their inactions in failing to object to the plan did not proximately cause the accident that resulted in Zachariah's injuries.

{¶ 9} Plaintiffs filed memoranda contra Ramge's and Barnes's motions for summary judgment. Plaintiffs argued that genuine issues of material fact existed as to the existence of a joint enterprise and Ramge's and Barnes's participation therein. Plaintiffs further asserted that Ramge's and Barnes's duty

---

1. Plaintiffs also asserted a negligence claim against Roby and a claim for underinsured-motorists benefits against their insurance carrier, Nationwide Mutual Insurance Company.

of care arose from the foreseeability of harm in placing an obstruction on a roadway at night. Plaintiffs further maintained that Ramge and Barnes owed Zachariah a duty of care pursuant to R.C. 4511.74 and 2909.09.

{¶ 10} By decision filed November 27, 2007, the trial court found that plaintiffs' general-negligence claims failed because neither Ramge nor Barnes owed Zachariah a duty of care. In so finding, the court determined that neither Ramge nor Barnes was present when the target deer was stolen, painted, or assembled, that neither participated in placing the target deer in the roadway, and that the two merely rode along with the other codefendants. The court further found that no special relationship existed between Ramge, Barnes, and the other codefendants giving rise to a duty to control the other codefendants' actions so as to prevent them from causing physical harm to Zachariah. The court also found that plaintiffs' imputed negligence claims failed because neither Ramge nor Barnes were engaged in a joint enterprise with the codefendants, as they failed to demonstrate that they had a right to control the conduct of the other codefendants or that the other codefendants were obligated to obey their directives. In addition, the court found that Ramge's and Barnes's inactions were not the proximate cause of Zachariah's injuries. Finally, the court found that since plaintiffs' underlying negligence claims failed, Piper's derivative claim for loss of consortium necessarily failed. The court concluded that no genuine issues of material fact existed and that Ramge and Barnes were entitled to judgment as a matter of law. Accordingly, the court granted summary judgment in their favor. The trial court journalized its decision by entry dated January 11, 2008.

{¶ 11} Plaintiffs have timely appealed, advancing one assignment of error for review:

> The trial court erred in granting summary judgment in favor of Defendants Carson Barnes and Joey Ramge when the record contains genuine issues of material fact regarding the negligence of these Defendants.

{¶ 12} Plaintiffs contend that the trial court erred in granting summary judgment for Ramge and Barnes, because genuine issues of material fact exist in the record.[2] An appellate court reviews a summary-judgment disposition independently and without deference to the trial court's determination. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153. In conducting such a review, an appellate court applies the same standard employed by the trial court. *Maust v. Bank One Columbus, N.A.* (1992), 83 Ohio App.3d

---

2. Roby, having commenced a separate action in the Franklin County Court of Common Pleas against, among others, Barnes, Ramge, Rogers, Lowe, Howard, Manns, and Campbell arising from the same set of operative facts, has filed, with leave of court, an amicus curiae brief in the instant action.

103, 107, 614 N.E.2d 765. Accordingly, an appellate court "review[s] the same evidentiary materials that were properly before the trial court at the time it ruled on the summary judgment motion." *Am. Energy Servs., Inc. v. Lekan* (1992), 75 Ohio App.3d 205, 208, 598 N.E.2d 1315. Proper evidentiary materials include only "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact." Civ.R. 56(C).

{¶ 13} Pursuant to Civ.R. 56(C), summary judgment is appropriate only where the evidence demonstrates that: (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) reviewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, and that conclusion is adverse to the nonmoving party. *State ex rel. Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343. Any doubts must be resolved in favor of the nonmoving party. *Viock v. Stowe–Woodward Co.* (1983), 13 Ohio App.3d 7, 12, 13 OBR 8, 467 N.E.2d 1378.

{¶ 14} The party seeking summary judgment initially bears the burden of informing the trial court of the basis for the motion and identifying those portions of the record demonstrating an absence of genuine issues of material fact as to the essential elements of the nonmoving party's claims. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. The moving party may not fulfill its initial burden simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Id. Rather, the moving party must support its motion by pointing to some evidence of the type set forth in Civ.R. 56(C) that affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. Id. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. Id. However, once the moving party satisfies its initial burden, the nonmoving party bears the burden of offering specific facts showing that there is a genuine issue for trial. Id. The nonmoving party may not rest upon the mere allegations and denials in the pleadings, but instead must point to or submit some evidentiary material that demonstrates a genuine dispute over a material fact. Civ.R. 56(E); *Henkle v. Henkle* (1991), 75 Ohio App.3d 732, 735, 600 N.E.2d 791.

{¶ 15} To establish actionable negligence, a plaintiff must prove that (1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, and (3) the breach of the duty proximately caused the plaintiff's injury. *Chambers v. St. Mary's School* (1998), 82 Ohio St.3d 563, 565, 697 N.E.2d 198, citing *Wellman v. E. Ohio Gas Co.* (1953), 160 Ohio St. 103, 108–109, 51 O.O. 27, 113 N.E.2d 629. Generally, a duty may be established by common law, legislative enactment, or by the particular facts and circumstances of the case. Id., citing *Eisenhuth v.*

*Moneyhon* (1954), 161 Ohio St. 367, 53 O.O. 274, 119 N.E.2d 440, paragraph one of the syllabus.

{¶ 16} In their assignment of error, plaintiffs contend that genuine issues of material fact exist as to whether Ramge and Barnes were negligent. The negligence at issue, whether characterized by plaintiffs as independent or imputed, is a product of the relationship Ramge and Barnes shared with the other codefendants as members of a joint enterprise.

{¶ 17} In *Bloom v. Leech* (1929), 120 Ohio St. 239, 166 N.E. 137, the Supreme Court of Ohio held that although the doctrine of imputed negligence does not ordinarily apply in Ohio, an exception exists when parties are engaged in a joint enterprise. Id., paragraph one of the syllabus. "A 'joint enterprise' within the law of imputed negligence is the joint prosecution of a common purpose under such circumstances that each member of such enterprise has the authority to act for all in respect to the control of the agencies employed to execute such common purpose." Id., paragraph two of the syllabus. The *Bloom* court acknowledged the following as "[a] good statement of the rule and one recognized in many states":

> "Parties cannot be said to be engaged in a joint enterprise, within the meaning of the law of negligence, unless there be a community of interests in the objects or purposes of the undertaking, and an equal right to direct and govern the movements and conduct of each other with respect thereto. Each must have some voice and right to be heard in its control or management."

Id. at 244, 166 N.E. 137, quoting *St. Louis & Sante Fé RR. Co. v. Bell*, 58 Okla. 84, 159 P. 336, L.R.A.1917A, 543.

{¶ 18} Thus, pursuant to *Bloom*, in order for an individual to be engaged in a joint enterprise within the meaning of the law of negligence, there must be a community of interests in the purpose of the enterprise, and the individual must have some voice and right to be heard in its control or management. Here, the purpose of the enterprise was to place the target deer in the roadway and observe how motorists would respond to the situation. Thus, the issue resolves to whether Ramge and Barnes had an interest in that purpose and some voice and right to be heard in its control.

{¶ 19} The deposition testimony of Ramge, Barnes, and the other codefendants creates a genuine issue of material fact as to whether Ramge and Barnes shared a common interest and purpose in the endeavor. Barnes testified that he first learned of the plan via a telephone call from Manns on the night of the incident. According to Barnes, although Manns did not reveal any specifics about the plan, Barnes "knew they were talking about putting a fake deer on a road." Barnes further testified that he went to Lowe's house because he "want[ed] to go along

for the ride" and "want[ed] to go see what they were doing." When he and Ramge arrived at Lowe's house, the others were loading the target deer into the back of Lowe's SUV. According to Barnes, he rode in Lowe's vehicle, rather than take Ramge's vehicle, because he "wanted to be part of the group." He also stated that he "wanted to be in the car—[he] just wanted to watch." Indeed, Barnes admitted that he fully understood the plan when he got into Lowe's SUV. He further acknowledged that he went with the group to observe motorists' reactions to the target deer.

{¶ 20} Ramge testified that he was with Barnes when Barnes received the telephone call from Manns. Barnes informed Ramge of the plan, and he and Barnes discussed whether to participate. According to Ramge, neither he nor Barnes really wanted to go, but Manns "egged [them] on." Ramge admitted that he would have felt comfortable telling Manns he did not want to participate; however, he voluntarily chose to do so. He further testified that he got into Lowe's vehicle because he "wanted to go with them." According to Ramge, he was "part of the common group out there" and "was with them." Ramge further testified that the reason the group drove back and forth on CR 144 was to observe motorists' reactions when confronted with the target deer. Ramge acknowledged that he told the police after the accident that the outing was intended "to be like a prank, and it turned into something *we* didn't really want it to be."

{¶ 21} Similarly, Lowe testified that when Barnes and Ramge arrived at the house, the group discussed the plan. Ramge and Barnes voluntarily decided they wanted to go along; they were not "force[d]" to go. According to Lowe, neither Barnes nor Ramge voiced any objection to the plan nor attempted to stop the plan from going forward; indeed, they "both were going along with everybody." Lowe described the enterprise as a "prank" that "everybody went along with." Lowe further testified that when the group placed the target deer in the roadway, they had an "expectation this was going to cause motorists going eastbound to react in some fashion."

{¶ 22} Manns testified that the group's purpose in placing the target deer in the roadway was to "make cars slow down or maybe hit it" and that the group wanted to watch what would happen. According to Manns, everyone in the group knew the purpose of the excursion, and they were "all in this together." No one objected to the plan; indeed, Manns described it as something they were "all doing jointly."

{¶ 23} Similarly, Howard testified that the six who entered Lowe's vehicle acted "all together" in a "joint prank." Indeed, he described the effort to place the deer in the roadway as a "team approach." He further described the venture

as a "prank" to see how motorists would react when suddenly confronted with a target deer in the roadway.

{¶ 24} Campbell testified that no one objected to the idea of placing the target deer in the roadway; indeed, it was "kind of a mutual choice" and "[e]verybody [was] in it together." He described the enterprise as a "team effort" with "everybody in there together." He further stated that the outing was merely a "prank" to "get some laughs." Campbell noted that he told the police after the accident that when the group noticed the car that was traveling at a high rate of speed toward the target deer, the six were all laughing in anticipation of it hitting the target deer.

{¶ 25} Thus, the foregoing testimony establishes that Ramge and Barnes knew of the plan to place the target deer in the roadway before they voluntarily drove to Lowe's house to join the group, watched as the target deer was loaded into the SUV, and knew that the occupants of the SUV intended to place the target deer in the roadway. The testimony further establishes that Ramge and Barnes shared the group's interest in wanting to observe what would happen when motorists encountered the target deer in the roadway and that they voluntarily entered the SUV with full knowledge of the plan. Hence, this evidence creates a genuine issue of material fact as to the first element of the test for joint enterprise, i.e., whether Ramge and Barnes shared a common interest and purpose in participating in the enterprise.

{¶ 26} Similarly, the deposition testimony of Ramge, Barnes, and the other codefendants creates a genuine issue of material fact as to the second element of the test for joint enterprise—whether Ramge and Barnes had an equal right to direct and govern the movements and conduct of the group with respect to the endeavor, i.e., whether each had some voice and right to be heard in its control. Although Ramge and Barnes may not have physically placed the target deer on the roadway, they were members of the group that communally decided where to place it. Ramge testified that "[e]verybody agreed where to put [the target deer]." Howard testified that no one person chose the spot on CR 144; rather, the group "[k]ind of all did it." Campbell testified that the group jointly engaged in the discussion about where to place the target deer. According to Campbell, after he suggested CR 144, the group discussed several alternatives; however, all six "eventually decided [on] [CR] 144." Similarly, Lowe testified that the six jointly agreed to the location on CR 144 suggested by Campbell. Manns described the selection of the location on CR 144 as a "team effort, a team idea."

{¶ 27} Further, the testimony demonstrates that it was unnecessary for either Ramge or Barnes to personally place the target deer in the roadway, as it was made of a light-weight material that did not require all members of the group to carry it. To that end, Howard testified that the target deer "looked like" it was

made of "Styrofoam" and, as such, that there was no need for everyone in the vehicle to participate in placing it in the roadway. Lowe also testified that the target deer was made of Styrofoam; he stated that it was "pretty light," so there was no need for six people to carry it. Manns stated that because the deer was made of "foam," there was no need for all six of them to carry it. Campbell, who physically carried the target deer from the SUV and placed it on the roadway, testified that it did not take six people to carry it.

{¶ 28} Campbell testified that none of the six could be described as the leader of the group; rather, "everybody had an equal participation in this venture that night." Similarly, Howard stated that there was no leader or "take-charge guy of [the] group." According to Lowe, there was no "true leader" of the excursion; rather, "everyone [was] as a group working together." Lowe further testified that after they observed Roby's car in the field off the roadway, Barnes said, "[W]e can't stop because there's too many of us; [t]hey'd know we did it." According to Lowe, some members of the group wanted to stop; however, the group ultimately "went along with what Carson suggested" and left the scene.

{¶ 29} Similarly, Manns testified that there was no "ringleader" orchestrating the endeavor; rather, it was a "kind of one-for-all, all-for-one kind of thing." He further stated that no one in the group had any more or less to do with placing the target deer in the roadway than anyone else, as the group was "all in it together." Manns further testified that any of the members of the group could have stopped the plan had they chosen to do so.

{¶ 30} In addition, Barnes testified that had he chosen to do so, he could have spoken out against the plan and removed the target deer from the roadway. Ramge testified that he had an equal voice in the enterprise and that he was free to say anything he wanted to about the plan. Indeed, Ramge stated that he had the opportunity to remove the target deer from the roadway, but did not do so.

{¶ 31} The foregoing testimony establishes that Ramge and Barnes took part in deciding where to place the target deer, were free to speak out against the plan, could have stopped the plan or removed the target deer from the roadway, and were equal participants in the group, which had no distinct leader. As well, the evidence establishes that the other members of the group heeded Barnes's suggestion that they flee the accident scene. Accordingly, this evidence creates a genuine issue of material fact as to the second element of the test for joint enterprise, i.e., whether Ramge and Barnes had an equal voice in controlling the operation of the enterprise.

{¶ 32} We find the case of *W. Am. Ins. Co. v. Carter* (1989), 50 Ohio Misc.2d 20, 553 N.E.2d 1099, to be the closest in point on the issue of joint enterprise. There, three juveniles were traveling in an automobile when it developed mechanical problems. The three abandoned the automobile and began walking. They

proceeded to a parking lot where one of the juveniles noticed the keys in the ignition of a parked car and suggested that they steal it. The same juvenile got into the driver's seat; the two others entered the car. The driver eventually crashed the car. All three of the juveniles fled the scene; they were apprehended and admitted their criminal involvement to law-enforcement authorities.

{¶ 33} One of the issues to be decided by the court was whether the two juvenile passengers in the stolen vehicle could be found liable for the resulting damages to the vehicle, regardless of the fact that they did not actively participate in the operation of the vehicle. At the outset, the municipal court quoted *Wills v. Anchor Cartage & Storage Co.* (1927), 26 Ohio App. 66, 72, 159 N.E. 124, which stated:

"We understand that when a passenger in an automobile becomes engaged in a joint enterprise and urges on the driver of the car, or does something which indicates that he participates in the misconduct, if there is misconduct on the part of the driver, that then, of course, such negligence may be attributed to him."

*Carter* at 22, 553 N.E.2d 1099.

{¶ 34} The *Carter* court went on to note that negligence due to a joint enterprise should be strictly confined to circumstances in which two or more persons unite in the joint prosecution of a common purpose and each has the authority, either express or implied, to act for all in respect to the control of the means employed to execute the common purpose. In applying that standard, the court stated that the three juveniles were engaged in a joint enterprise whereby the negligence of the driver could be imputed to the two other occupants.

{¶ 35} In so finding, the court noted that all three of the juveniles were stranded as a result of mechanical problems with their vehicle. All three walked into the parking lot under circumstances suggesting that they had a common purpose to steal another vehicle. All three voluntarily entered the vehicle with the purpose of stealing it. Each knew what was about to happen, and each could have made the decision not to enter the vehicle. After crashing the vehicle, each fled from the scene.

{¶ 36} The court found that the foregoing facts indicated a common purpose and design. More specifically, the court determined that by voluntarily entering the vehicle, the two passengers were impliedly authorizing the driver to act for them. The court concluded that "[t]o find otherwise would lead to a result where persons commonly united in a criminal scheme or plan could escape civil liability for their acts. Fairness and justice to the victim demand that such a result under these circumstances not be reached." Id. at 22, 553 N.E.2d 1099.

{¶ 37} As in *Carter*, 50 Ohio Misc.2d 20, 553 N.E.2d 1099, Ramge and Barnes knew about the plan to place a target deer in the roadway before they entered Lowe's SUV. Each entered the SUV voluntarily under circumstances suggesting that they had a common purpose in placing the target deer in the roadway and observing motorists' reactions to the situation. Each knew what was about to happen and each could have decided not to enter the SUV. After the accident, all six fled the scene. By entering the SUV with knowledge of what was to happen, each impliedly authorized the driver of the vehicle and those persons who physically placed the target deer in the roadway to act for them.

{¶ 38} After construing the evidence in a light most favorable to plaintiffs, we find that reasonable minds could differ as to whether Ramge and Barnes were engaged in a joint enterprise with the other codefendants to place the target deer in the roadway. More specifically, we find that the evidence submitted by plaintiffs in opposition to Ramge's and Barnes's motions for summary judgment creates general issues of material fact as to whether Ramge and Barnes shared a common interest in the purpose of the enterprise and whether they had an equal voice in controlling the operation of the enterprise. Accordingly, we find that the trial court erred in granting summary judgment for Ramge and Barnes on plaintiffs' joint-enterprise-imputed-negligence claim.

■■ {¶ 39} We also find that the foregoing evidence creates genuine issues of material fact as to whether Ramge and Barnes owed Zachariah a duty pursuant to R.C. 4511.74 and 2909.09. As noted previously, a duty may be established by legislative enactment. *Chambers*, 82 Ohio St.3d at 565, 697 N.E.2d 198. When a legislative enactment imposes a specific duty for the safety of others, failure to perform that duty is negligence per se. Id., citing *Eisenhuth*, paragraph two of the syllabus.

{¶ 40} R.C. 4511.74(A) states:

No person shall place or knowingly drop upon any part of a highway * * * any * * * articles which may damage or injure any person, [or] vehicle, * * * traveling along or upon such highway, except such substances that may be placed upon the roadway by proper authority for the repair or construction thereof.

Any person who drops or permits to be dropped or thrown upon any highway any destructive or injurious material shall immediately remove the same.

{¶ 41} R.C. 2909.09(B) provides:

No person shall knowingly, and by any means, drop or throw any object at, onto, or in the path of any of the following:

(1) Any vehicle * * * on a highway.

{¶ 42} It is undisputed that one or more of Ramge's and Barnes's codefendants knowingly placed the target deer in the eastbound travel lane of CR 144. As noted above, under the joint-enterprise doctrine, the liability of any member of the joint enterprise is imputed to all other members of the enterprise. Accordingly, because genuine issues of material fact remain to be litigated as to Ramge's and Barnes's participation in the joint enterprise, genuine issues of material fact also remain as to whether Ramge and Barnes owed plaintiffs a duty pursuant to R.C. 4511.74 and 2909.09.

{¶ 43} Finally, we address the issue of proximate cause. In *Welch v. Bloom*, Lucas App. No. L–04–1003, 2004-Ohio-3168, 2004 WL 1373270, the court stated that "[n]ormally, the issue of proximate cause involves questions of fact and cannot be resolved by means of summary judgment." Id. at ¶ 11, quoting *Whiteleather v. Yosowitz* (1983), 10 Ohio App.3d 272, 274, 10 OBR 386, 461 N.E.2d 1331. "However, if the facts are undisputed, the issue becomes a question of law which can be determined on summary judgment." Id.

{¶ 44} To establish proximate cause, the plaintiff must prove that his injuries were the natural and probable consequence of the negligent act. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 287, 21 O.O.3d 177, 423 N.E.2d 467. The plaintiff must prove more than the fact that he was injured; he must prove that his injury was caused by some negligent act or omission by the defendant. *J.C. Penny Co. v. Robison* (1934), 128 Ohio St. 626, 1 O.O. 299, 193 N.E. 401, paragraph four of the syllabus. The injury must have been reasonably foreseeable; not that the defendant had to anticipate the particular injury that occurred, just that it could be reasonably anticipated that some type of injury would occur from the negligent act. *Strother.*

{¶ 45} Here, the trial court characterized Ramge and Barnes as "passive witnesses" to the incident, as neither "actively participated in stealing, painting, loading and placing the deer on the roadway." Accordingly, the trial court concluded that Ramge's and Barnes's inactions in failing to object to the plan were not the proximate cause of plaintiffs' injuries. Both Ramge and Barnes concede in their briefs that the actions of the other codefendants in placing the target deer in the roadway proximately caused Zachariah's injuries. As noted, this court has determined that genuine issues of material fact exist as to whether the actions of the other codefendants may be imputed to Ramge and Barnes under theories of joint enterprise and of negligence per se. Accordingly, genuine issues of material fact remain to be litigated as to the issue of proximate cause as it relates to Ramge and Barnes.

{¶ 46} Finally, as plaintiffs' joint-enterprise-imputed-negligence and negligence per se claims remain viable, so, too, does Piper's claim for loss of consortium.

{¶ 47} For the foregoing reasons, we hold that the trial court erred in granting summary judgment for defendants Ramge and Barnes. Accordingly, we sustain plaintiffs' single assignment of error, reverse the judgment of the Franklin County Court of Common Pleas, and remand the matter for further proceedings in accordance with law and consistent with this opinion.

Judgment reversed<br>and cause remanded.

PETREE and SADLER, JJ., concur.

T. BRYANT, J., retired, of the Third Appellate District, sitting by assignment.